UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

DAVID SCOTT PREAST,

     Plaintiff,

v.                                  Case No. 3:18cv319-HTC

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

     Defendant.
_____/

MEMORANDUM ORDER

This matter is before the Court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying David Scott Preast's ("Preast") application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-34.  The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73 for all proceedings in the case, including entry of final judgment.  Upon review of the record, the Court finds that the decision of the Commissioner should be reversed, and this matter remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g).

## I.      Statement of the Issues

Preast raises three issues before this Court: (1) the ALJ erred in not fully developing the record; (2) the Appeals Council's reasons for according "no weight" to the disability determination of the Florida Department of Retirement Services is not supported by substantial evidence; (3) the Appeals Council's failure to consider additional evidence from Preast's treating physicians is not supported by substantial evidence.

## II.     Procedural History

On September 15, 2014, Preast filed a Title II application for disability insurance benefits, alleging disability beginning March 24, 2014.  Tr. 238-66.[1]  A hearing before the ALJ was held June 3, 2016, at which a vocational expert testified and at which Preast appeared without representation.  Tr. 112-52.  The ALJ issued an opinion on November 2, 2016, finding that Preast was not disabled.  ECF Doc 8-2 at 16.  The Appeals Council accepted review of the decision, and allowed Preast, then represented by counsel, to submit the following additional evidence:[2]

- Treatment notes of Dr. Zielinski dated 11/18/2014 to 6/24/2016 (Tr. 58-85);
- Treatment notes of Dr. Zielinski dated 1/3/2017 to 7/18/2017 (Tr. 45-57);

---

[1] The administrative record filed by the Commissioner consists of 12 volumes (ECF Docs. 8-2 through 8-12) and has 626 consecutively-numbered pages.  References to the record will be by "T.," for transcript, followed by the page number.

[2] Counsel for Preast also submitted documentation relating to student loan forgiveness, Tr. 4, but that evidence is not germane to this case.

- Treatment notes of Dr. Le dated 2/5/2015 to 10/28/2016 (Tr. 89-111)
- Treatment notes of Dr. Le dated 2/3/2017 (Tr. 86-88)

Tr. 4-5.[3]

The Appeals Council issued a decision denying benefits on January 9, 2018. Tr. 4-8.  The Appeals Council's decision is the final decision of the Secretary.  *See Keeton v. Department of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

Preast filed the instant action seeking judicial review under 42 U.S.C. § 405(g) on February 28, 2018.  ECF Doc. 1.  The Commissioner filed an answer with the transcript and administrative record.  ECF Doc. 8.  Preast filed a memorandum in support of his complaint, ECF Doc. 18, and the Commissioner filed a memorandum in support of the Commissioner's decision.  ECF Doc. 19.  Preast also filed a reply to the Commissioner's memorandum.  ECF Doc. 22.  The matter is thus ripe for review.

## III.   Factual Background

### A.   The hearing testimony

At the beginning of the hearing the ALJ advised Preast he had "the right to be represented by an attorney or non-attorney representative who can obtain and submit

---

[3] Preast also submitted a letter from Florida Department of Management Services, dated 12/23/15 (which was duplicative of evidence submitted to the ALJ).

medical records, explain medical terms, make requests, protect rights or just help you to present the evidence in a light most favorable to your case." Tr. 115. The ALJ also advised that he would grant one continuance to allow Preast to obtain counsel if he desired. Preast understood this right but wanted to "go ahead and proceed." *Id.*

Preast testified he was 56 years old and his past relevant work was as a school principal and teacher. Tr. 125-26. He has a bachelor's and a master's degree and was a principal for four years and an assistant principal for five years. *Id.* at 16. He has also worked as a teacher of biology, marine science and environmental science. *Id.* Preast, who was 5'9" and weighed 178 pounds on December 1, 2015, Tr. 114, had recently lost 125 pounds through bariatric surgery. Tr. 126. He explained he had the surgery to keep working and to help or eliminate disc problems in his back, asthma, blood pressure/diabetes, and pain from a benign tumor in his femur. Tr. 126-27.

Preast discussed his asthma, stating that although he was successfully treated for it in the 1990s, he is on the same levels of steroids, inhalers and compressor nebulizers but they are "not working like they used to" and he is still getting all the side effects. Tr. 127. He testified that he suffers shortness of breath and "it's just the asthma comes forward too far" to cut back on his medications to alleviate the side effects. *Id.*

Preast testified he could only sit or stand for about 15 to 20 minutes due to pain radiating down his right leg. Tr. 128. He complained that "it's the nerve, that burn that goes down just past your knee." Walking around "slackens it to a certain point and then that's when I need to ... lay down." Tr. 129. Preast stated he could stand for 20 to 25 minutes before experiencing "burning pain" and numbness and would have to sit down. *Id.*

Preast also complained of headaches, which testimony took up the bulk of the hearing. Tr. 130-22. He testified he had headaches that felt like "broken glass" and which caused him to not be able to see out of his right eye. He stated his doctors told him his headaches are tied to his blood pressure and that when he has a headache, his systolic pressure was "usually up around 190" and had gotten above 200. Preast complained that "I can actually see my heartbeat in my eye" when he is having one of these headaches. Tr. at 130. He testified they happen "every other day or it could be two days in a row." Tr. 131. He deals with the headaches by moving into a dark room, "laying down at an angle", and letting the medications take effect. *Id.* When asked about his daily activities, Preast complained that "a lot of times I just go lay down if the headache starts, just I cannot function with these headaches because I can't see and, honestly, it's just extremely painful." Tr. at 134.

Preast testified that he sees Dr. Le "at least every three months" but can also communicate his blood pressure to Dr. Le by email between those visits. Tr. 133.

He testified he also sees Dr. Zielinski and that Dr. Le had to make sure the medications prescribed by the two of them did not conflict. *Id.*

Preast also testified about his daily activities and limitations. Preast stated he used to help with meals, vacuuming and laundry but stated, "I do very, very little of that now." Tr. 135. He testified he occasionally drove to the store or went with his wife but that he sometimes simply stayed in the car because the walking was too difficult for him. Tr. 135-36. Preast stated the heaviest thing he could lift was a seven-pound bag of dog food or a gallon jug of liquid. Tr. 136-37. Preast's wife testified at the hearing as well, but her testimony simply reiterated Preast's testimony and added that he also suffered from acid reflux. Tr. 146-47.

The ALJ also solicited testimony from a vocational expert regarding two hypotheticals. The first was as follows:

> [A]ssume an individual who is the same age, with the same education and the same past work experience as the claimant who is limited to the light exertional level. He can do no climbing of ladders, ropes or scaffolding and he can occasionally climb stairs. He can occasionally stoop or crouch. He would need to avoid concentrated exposure to extreme heat or to extreme cold, avoid concentrated exposure to high humidity. He would need to avoid concentrated exposure to dust, fumes and gases and also avoid concentrated exposure hazards in the workplace. With those limitations, would the individual be able to perform his past work?

Tr. 149-50. The vocational expert stated such an individual could perform his past relevant work as a principal and teacher. The ALJ then added the following restrictions to the hypothetical:

> Now if the individual, though, was limited to basically the sedentary lifting level, but could sit for two hours a day and stand and walk for two hours a day; he would – he may need to lie down for some periods of the day after those four hours, would there be any work that the individual could perform?

Tr. 150. The vocational expert answered in the negative. *Id.*

### B.    The Treating Physicians

The ALJ attached eighteen (18) exhibits containing medical records to the hearing decision. These records include treatment and progress notes as well as medical source statements or opinions. Additionally, the records are from January 2009 to November 2014. Only those records which are relevant to the issues on appeal are discussed below.

### 1.    Dr. Le:

Preast began receiving treatment from Dr. Le, a cardiologist, at Sacred Heart Medical Group in January 2013 primarily for high blood pressure and resulting headaches. Tr. 386-422, 595-615, 621, 622-26. In January 2013, Preast reported headaches usually frontal, right side, with occasional pounding and nausea, over last 3 months progressively getting worse over last six weeks. Tr. 420. He had a CT scan of the brain due to "chronic intermittent headaches" that showed "no infections, no masses, aneurysms, etc." Tr. 418. He continued to report headaches so severe in March 2013 that he could feel and see his heartbeat. Tr. 398. In May 2013, his headaches were occurring daily. Tr. 396. In January 2014, he reported to Dr. Le

that his headaches are "still present but have improved since last medication change." Tr. 395. Dr. Le also treated him for high blood pressure and in August 2013, he reported that his blood pressure had been as high as 170/100s, with palpitations. Tr. 392.

In January and February 2014, Dr. Lee opined that Preast was a candidate for bariatric surgery due to his obesity. Tr. 388-91, 413. In June 2014, following his Laparoscopic Vertical Sleeve Gastrectomy surgery, Preast's diagnoses included obesity, hypertensive disorder, sleep apnea, kidney stone, hypercholesterolemia, gastroesophageal reflux disease, asthma, body mass index 40+ severely obese. Tr. 512, 515-16, 535, 542, 562. As of two months after his surgery, on August 14, 2014, Preast had lost 70 pounds and resolved his morbid obesity. Tr. 594. As of November 18, 2014, Preast had lost 100 pounds since his surgery, but was experiencing increased fatigue. Tr. 598.

On April of 2015, Dr. Le checked "Yes" on a form that asked if Preast had a:

> physical or mental impairment that (a) prevents [him] from engaging in any substantial gainful activity, in any field of work, and (b) can be expected to result in death, or has lasted for a continuous period of not less than 60 months, or can be expected to last for a continuous period of not less than 60 months.

Tr. 614. The form was for Preast's disability retirement application to the Florida Department of Retirement Services ("FDRS"). Dr. Le handwrote in section 3 of that form that Preast was limited in sitting, standing, walking, or lifting because he "has

headaches, visual disturbances, nausea and has to lie down frequently." *Id.* He also had "limitations with continuous work." *Id.* In a letter dated December 3, 2015, Dr. Le wrote that Preast was under his care on June 30, 2014 and "[h]is condition at that time and today demonstrate '[s]evere limitations of functional capacity; permanently and totally disabled from gainful employment.'" Tr. 616, 621.

Dr. Le also completed a form for the FDRS dated November 24, 2015, indicating that he first treated Preast in 2013 and his most recent visit was October 9, 2015; his primary condition was severe hypertension and his secondary conditions were "severe headaches [and] nausea from severe [hypertension] causing visual disturbance." Tr. 619. Dr. Le further opined that the restrictions placed on Preast's activities included a need to "lie down frequently." *Id.*

In a physical capacities assessment dated May 20, 2016, Dr. Le opined that Preast could sit for two hours in a 8-hour workday on a sustained basis; stand and/or walk for two hours in a 8-hour workday; never lift any weight on a sustained basis; could not use his feet for repetitive movements or pushing and pulling of leg controls on a sustained basis; required complete freedom to rest frequently without restrictions; and it was necessary for him to lie down for substantial periods of time during the day. Tr. 622-23.

In a questionnaire, Dr. Le further opined that Preast's impairments were hypertension, palpitations, and headaches. Tr. 624. He cited significant objective

and clinical findings of "[b]lood pressure still not well controlled despite maximum medical therapy," with the systolic still in the 160's to 170's and the diastolic in the 90-100's, requiring medication changes. *Id.* According to Dr. Le, Preast's most frequent side effects were GI upset and hypotension as well as hypo/hyperkesemia from spirolactone and HZTZ. *Id.*

Dr. Le also opined that Preast's pain was "severe," and that his complaints of headache, nausea, and visual disturbance were consistent with his findings of uncontrolled hypertension and were credible. Tr. 624-25. He also opined that Preast was not able to perform sedentary or light work on a sustained basis. Tr. 625- 26. Dr. Le listed June 30, 2014, as the date Preast's impairments were at the level indicated. Tr. 626. Finally, Dr. Le reported that Preast had "uncontrolled [hypertension] despite maximum medical therapy and no secondary cause has been found." *Id*.

### 2. Dr. Zielinski:

Dr. Zielinski has treated Preast since 2010. Tr. 620. He has seen Preast for asthma, hypertension and headaches. *Id.* The only progress note from Dr. Zielinski contained in the record before the ALJ, however, was dated November 18, 2014. Tr. 598-603. The reason for Preast's visit was "increased fatigue" and hypertension, post gastric bypass surgery. Tr. 598. The note indicates Preast was also being seen for "routine clinical follow-up of headaches". *Id.* At that time, Preast's blood

pressure was 140/86 and his "[b]lood pressure control has been good." Tr. 598, 600. His active problem list included acute bronchitis, alopecia, arteriosclerotic heart disease, asthma, essential hypertension generalized anxiety disorder, obesity, sleep apnea, asthma. Tr. 598-99. The assessment was asthma, arteriosclerotic heart disease, fatigue, headache, and essential hypertension and Dr. Zielinski changed his medication from Butalbutal to Floricet and increased the dosage of alopecia. Tr. 601.

Dr. Zielinski also completed a form for the FDRS, indicating that he first treated Preast in 2000 and his most recent visit was December 1, 2015; his primary conditions were chronic asthma, acute hypertension and debilitating headaches. Tr. 620. He further opined that Preast had a "severe limitation of functional capacity," was "permanently incapable of any kind of work" and was "totally and permanently disabled from gainful employment." *Id*. On December 11, 2015, Dr. Zielinski responded to a question from the FDRS stating that the disabling conditions which prevent Preast from being employed included chronic asthma, generalized anxiety disorder, primary hypertension, and severe headaches. Tr. 617.

## IV. Underlying Decisions Subject to Review

### 1. The ALJ's Findings

In his decision, the ALJ found that Preast had the following severe impairments: "degenerative disc disease of the lumbar spine, mild degenerative joint

disease of the hips, hypertension, coronary artery disease, and asthma." Tr. 17. In addition, the ALJ found that Preast had the following non-severe impairments: obesity, headaches, sleep apnea, hyperlipidemia, and anxiety, as "these conditions have either been successfully treated, controlled, stabilized, or otherwise do not more than minimally affect the claimant's ability to perform basic work activity." Tr. 18. The ALJ concluded that Preast retains the residual functional capacity ("RFC") to perform light work and can:

> occasionally climb stairs but never climb ladders, ropes or scaffolds, he can occasionally stoop and crouch, and he must avoid concentrated exposure to extreme heat and cold, high humidity, workplace hazards, and dust, fumes, and gasses.

Tr. 20.

The ALJ found, however, that Preast's allegations of severe functional limitations relating to his impairments, specifically his "shortness of breath," his testimony regarding the length of time he could sit, stand and walk, and his testimony that his "hypertension medication causes dizziness and headaches," are "not entirely consistent with the medical evidence." Tr. 22. The basis of the ALJ's credibility assessment was that Preast's assertions "are not consistent with medical records showing no indication that he has been treated for any of his alleged impairments since November 2014, at which time he was noted as having a normal gait and station as well as stable hypertension." *Id.*

The ALJ also discounted the opinions of Preast's treating physicians, Drs. Zielinski and Le. He compared those opinions – dated November and December 2015 and May 2016 -- to the physicians' progress notes and found that "Dr. Zielinksi contradicted his own findings" and "Dr. Le's opinion is not supported by any medical evidence." Tr. 22. Thus, the ALJ assigned "little weight" to both treating physicians' opinions.

In contrast, the ALJ gave great weight to the opinions of non-examining state agency consultants. Jessica Anderton, Psy.D., reviewed the evidence of record on November 10, 2014, and opined that Mr. Preast's anxiety disorder was not severe as it resulted in no restriction of daily activities or social functioning; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. Tr. 158-59. Jill Rowan, Ph.D., affirmed these findings on reconsideration on January 23, 2015. Tr. 171-72. Debra Troiano, M.D., opined on reconsideration on February 4, 2015, that Preast had severe impairments of essential hypertension, ischemic heart disease, obesity, and asthma. Tr. 171. She opined that Mr. Preast could occasionally lift 20 pounds and frequently lift 10 pounds; stand/walk for 6 hours in an 8-hour workday and sit for 6 hours in an 8-hour workday; could occasionally climb ramps/stairs and never climb ladders/ropes, scaffolds; could occasionally crouch; and should avoid concentrated exposure to: (1)

extreme cold; (2) extreme heat, (3) humidity; (4) fumes, odors, dusts, gases, poor ventilation, etc; and (5) hazards. Tr. 173-75.

The ALJ therefore found that Preast's residual functional capacity is as described in the first hypothetical given to the vocational expert during the hearing. The ALJ then relied upon the answer of the vocational expert to that question and found that Preast is able to perform his past relevant work as a teacher and is therefore not disabled. Tr. 22-23.

## 2. The Appeals Council's Decisions

The Appeals Council granted Preast's request to review the ALJ's decision. Tr. 228. In its Notice of Action, the Appeals Council specifically stated that an "error of law" had occurred. *Id.* The Appeals Council further stated in its decision that "[t]he purpose of this corrective unfavorable decision is primarily to acknowledge and consider the decision of the Florida Department of Retirement Services, dated December 23, 2015, approving the claimant for 'regular disability retirement benefits.'" Tr. 5. The Appeals Council specifically considered the FDRS decision but gave it no weight because of "its lack of reference to any medical evidence and lack of any indicated author or attribution." Tr. 7.

The Appeals Council also acknowledged that Preast had submitted additional medical evidence consisting of two groups: treatment notes from visits before the hearing decision date, and treatment notes from after the hearing decision date. The

Appeals counsel, however, did not consider and exhibit the additional medical evidence for the period <u>before</u> the date of the ALJ's written decision, November 2, 2016, because "this additional evidence does not show a reasonable probability that it would change the outcome of the decision." Tr. 4. Also, the Appeals Council did not consider and exhibit the additional medical evidence dated <u>after</u> the date of the ALJ's written decision because "it does not affect the decision about whether the claimant was disabled beginning on or before November 2, 2016." Tr. 5.

The Appeals Council adopted the ALJ's "findings and conclusions regarding whether the claimant is disabled, and to find him not disabled." *Id.* Specifically, the Appeals Council adopted "the conclusions of the hearing decision about the consistency of the claimant's statements and other subjective evidence with the medical and other evidence in the record." Tr. 6. The Appeals council also adopted the "little weight" given to the treating physicians' opinions. Tr. 7. The Appeals Council concluded its decision by writing separately on why Preast's anxiety is not a severe limitation because "our rules have changed recently about how we analyze the severity of mental impairment and how we explain our analysis." Tr. 6.

## V.     Analysis

### A.     Standards of Review

First, federal courts "review the [Commissioner's] decision with deference to the factual findings and close scrutiny of the legal conclusions." *Cornelius v.*

*Sullivan,* 936 F.2d 1143, 1145 (11th Cir.1991); *accord Martin v. Sullivan,* 894 F.2d 1520, 1529 (11th Cir. 1990); *Graham v. Bowen,* 790 F.2d 1572, 1574–75 (11th Cir. 1986). The Commissioner's factual findings are conclusive if supported by "substantial evidence," 42 U.S.C. § 405(g), which is "relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir.1983). "Even if the evidence preponderates against the [Commissioner]'s factual findings, [the Court] must affirm if the decision reached is supported by substantial evidence." *Martin,* 894 F.2d at 1529. Second, federal courts review *de novo* the Commissioner's conclusions of law. *Id.* "The [Commissioner]'s failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (citing *Cornelius,* 936 F.2d at 1145–46.).

**B.    Application to the Instant Case**

As noted above, the decision of the Appeals Council is the final decision of the Commissioner in this case. For ease of analysis, the Court begins by considering Preast's third issue, whether the Appeals Council committed legal error by refusing to consider and exhibit the additional medical evidence.

1.      **Refusal of the Appeals Council to Consider and Exhibit the Additional Medical Evidence**

As set forth above, Preast submitted additional treatment notes from Drs. Zielinski and Le to the Appeals Council. Those notes included treatments subsequent to November 2014, but prior to the ALJ's decision, as well as after the decision. None of the additional evidence was considered by the Appeals Council. The Appeals Council's basis for rejecting the treatment notes predating the decision – that the additional evidence "does not show a reasonable probability that it would change the outcome of the decision" - is not supported by substantial evidence.

"With a few exceptions, the claimant is allowed to present new evidence at each stage of this administrative process," including before the Appeals Council. *Ingram v. Comm'r of Soc., Sec. Admin.,* 496 F.3d 1253, 1261 (11th Cir. 2007). The Appeals Council "must consider new, material, and chronologically relevant evidence" that the claimant submits. *Ingram,* 496 F.3d at 1261; *see also* 20 C.F.R. §§ 404.970(b). "We agree that when the Appeals Council erroneously refuses to consider evidence, it commits legal error and remand is appropriate." *Washington v. Soc. Sec. Admin., Com'r,* 806 F.3d 1317, 1320–21 (11th Cir. 2015) (citing *Farrell v. Astrue,* 692 F.3d 767, 771–72 (7th Cir. 2012); *Threet v. Barnhart,* 353 F.3d 1185, 1191–92 (10th Cir. 2003); *Bergmann v. Apfel,* 207 F.3d 1065, 1071 (8th Cir. 2000)).

20 C.F.R. § 404.970 provides the circumstances under which the Appeals Council will consider and exhibit evidence submitted by a claimant. Under

paragraphs 404.970(a)(5) and (b), the Appeals Council will consider and exhibit "additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." *Id.*

Additionally, where the Appeals Council declines to consider and exhibit additional evidence after granting review, it must articulate a basis for its decision. As the Eleventh Circuit explained in *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782–84 (11th Cir. 2014), whether an explanation of the decision to decline to consider an exhibit is required depends on whether the Appeals Council accepted or denied review of the case. In cases like *Mann v. Gardner*, 380 F.2d 182 (5th Cir. 1967), *Epps v. Harris*, 624 F.2d 1267 (5th Cir. 1980), and the instant case, where review of the case was accepted by the Appeals Council, an explanation is required.

Here, the Appeals Council's statement that the additional evidence submitted by Preast does not show "a reasonable probability that it would change the outcome of the decision," is not a sufficient explanation. Indeed, a similar basis was provided by the Appeals Council in *Epps* and was found to be insufficient. In *Epps*, the Appeals Council affirmed the ALJ's decision and "merely noted that it had considered the additional evidence submitted by Epps and found the ALJ's decision to be 'correct.'" *Epps*, 624 F.2d at 1272-73. The Eleventh Circuit held that, "[a]lthough the Appeals Council acknowledged that Epps had submitted new

evidence, it did not adequately evaluate it. Rather, it perfunctorily adhered to the decision of the hearing examiner. This failure alone makes us unable to hold that the Secretary's findings are supported by substantial evidence and requires us to remand this case for a determination of Epps' disability eligibility reached on the total record." *Id.* at 1273.

Additionally, in *Epps*, the ALJ's denial of benefits was based on the lack of radical treatment being required for claimant's back problems. *Id.* Similarly, in the instant case, the ALJ cited a lack of treatment after November of 2014 as a reason for rejecting Preast's subjective claims of headaches and hypertension and denying his claim for benefits. Tr. 22. Also, like in *Epps*, Preast submitted additional medical evidence to the Appeals Council showing he did, in fact, seek and receive treatment after November of 2014 for his hypertension and headaches.

The additional medical evidence submitted dated after November 2014 included the following, showing that Preast's hypertension and headaches had not been "successfully treated, controlled [or] stabilized," as determined by the ALJ.

On December 1, 2015, Preast saw Dr. Zielinski for renewal of his medications. At that time, Preast reported he (1) was "currently experiencing symptoms" of a headache, Tr. 58; (2) had a pain at level "8" in his head with blurriness in his right eye, Tr. 60, and (3) was prescribed Floricet for his headaches and various medications for his hypertension. Tr. 62. Although the doctor stated that "the patient

is doing well with his blood pressure goals" and that the "patient states he has been stable with his blood pressure control since last visit", his blood pressure was 170/100, and, on that particular day, he was "having a hard time controlling bp" and was being "work[ed] up by cardiology." Tr. 58, 60. Preast also received prescriptions for his headaches and hypertension on May 16, 2016 and June 24, 2016 from Dr. Zielinski. Tr. 81, 84.

On February 5, 2015, Preast saw Dr. Le and reported that "his blood pressure is out of control. . . . that he has frequent headaches and pounding in his head." Tr. 107. Dr. Le opined that "[t]he patient has uncontrolled hypertension," and Preast's blood pressure was 162/102. *Id.*

Dr. Le saw Preast again on April 7, 2015 for "severe hypertension," and his blood pressure was 162/92. Tr. 106. Preast also reported he "continues to have intermittent headaches which can be quite debilitating." *Id.* Dr. Le stated he remained "mildly hypertensive" and added Isordil and hydralazine to his regimen. *Id.*

On July 15, 2015, Preast again saw Dr. Le, complaining that he was "[s]till having [a] headache," on the right side and his chest has been "pounding" on and off for 3 weeks. Tr. 101. In the "Patient History" section, Dr. Le wrote that "bp still not with ideal control. It runs 160's at times." *Id.* Preast's blood pressure was 160/88. *Id.* Dr. Le noted, "If headache persists may need an MRI." Tr. 102.

On October 9, 2015, Preast visited Dr. Le for "bp monitor." Tr. 99. Dr. Le stated that "he is still high today; he has had head pounding." *Id.* Dr. Le advised Preast, "we need MRI of his head." *Id.*

On January 6, 2016, Preast visited Dr. Le for a follow-up for "elevated bp". Tr. 95. His blood pressure was 162/100, and heartrate was 82. Tr. 96. The treatment notes state that Preast "still gets frequent headaches." Tr. 95.

On April 13, 2016, Preast visited Dr. Le and brought his "bp diary." Tr. 92. Dr. Le noted Preast "still has significant HTN with sbp 160-170's." *Id.* His blood pressure the day of the exam was 172/90. Tr. 93. Dr. Le's assessment was "essential hypertension with goal blood pressure less than 130/80." *Id.*

Dr. Le's notes for September 20, 2016, indicate Preast suffers from "severe HTN" and "frequent headaches." Tr. 89. His blood pressure was 212/102, and Dr. Le assessed Preast as having "malignant HTN with heart disease" and "headache." Tr. 90. Dr. Le also noted that Preast is unable to tolerate many of the medications prescribed. *Id.*

On October 18, 2016, Preast was given a "CT scan of the head with and without contrast." Tr. 108. Although the scan was normal, the scan was ordered because of headaches. *Id.*

Finally, on February 3, 2017, Dr. Le examined Preast for hypertension and noted, "[h]e still has headaches." Tr. 86. Preast's blood pressure was 180/102 on February 3, 2017. Tr. 87.

These treatment notes from Dr. Zielinski and Dr. Le contradict the ALJ's determination that Preast's statements of his severe functional limitations relating to, among other things, hypertension and associated headaches, were not credible because the records showed "no indication that he has been treated for any of his alleged impairments since November 2014." Tr. 22. In his memorandum, the Commissioner cherry-picked various statements and clinical findings in claiming that Preast's "hypertension was generally asymptomatic" and that his headaches were routine and not disabling. ECF Doc. 19. To the contrary, the additional medical evidence shows that Preast's hypertension was considered by his doctors to be "uncontrolled", "not in ideal control", "severe", and "malignant" at various times during the visits set out in the additional medical evidence. In fact, the American Heart Association instructs that blood pressure above 180 on the systolic or 120 on the diastolic is a "hypertension crisis" which requires immediate medical attention.[4] Preast's systolic blood pressure was above 180 on at least two doctor visits.

---

[4] American Heart Association, *Hypertensive Crisis: When You Should Call 9-1-1 for High Blood Pressure*, (Nov. 30, 2017), https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings/hypertensive-crisis-when-you-should-call-911-for-high-blood-pressure

Additionally, his systolic blood pressure was routinely above 160, well above the cut-off for Stage II hypertension, which is 140. *Id.* Also, during this time, Preast's treating physicians characterized his headaches as "debilitating", "throbbing", "frequent" and "persisting."

Thus, the Appeals Council's determination that there is no "reasonable probability" that such evidence "would change the outcome of the decision," is not supported by substantial evidence. 20 C.F.R. § 404.970(a)(5); *see also, Epps*, 624 F.2d at 1273 ("The ALJ predicated his finding that Epps' back problem did not result in disabling pain or other incapacitating restrictions in significant part on his understanding that Epps had not required radical treatment. Yet the Appeals Council adopted the hearing examiner's decision without addressing post-hearing evidence of disability submitted by Dr. Kerr that expressly stated that conservative treatment had failed and that Epps had recently been referred for consideration of the radical intervention believed by the ALJ to be an important indicator of disability."). Accordingly, a remand is appropriate. *See Ingram,* 496 F.3d at 1268 (explaining that a sentence four, as opposed to sentence six, remand is appropriate when the evidence was properly before the Appeals Council, but "the Appeals Council did not adequately consider the additional evidence" (quotation marks omitted)).

Having determined that remand is appropriate, the Court need not address the other grounds of error but will nonetheless do so.

## 2. The ALJ's Failure to Develop the Record.

The latest treatment records for Preast from Drs. Zielinksi and Le considered by the ALJ were from 2014. This was so despite the fact that there was other evidence in the record indicating Preast had seen these doctors for treatment in late 2015. The ALJ's failure to fully develop the record was prejudicial error.

"Because a hearing before an ALJ is not an adversary proceeding, the ALJ has a basic obligation to develop a full and fair record." *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981); 20 C.F.R. § 416.912(d) (stating that "[b]efore we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application"); *Brown v. Shalala*, 44 F.3d 931, 934 (11th Cir. 1995). This duty is heightened as to an unrepresented claimant. *Clark v. Schweiker*, 652 F.2d at 404 (quoting *Barker v. Harris*, 486 F.Supp. 846, 849 (N.D.Ga.1980)) (the "basic obligation to develop a full and fair record rises to a special duty when an unrepresented claimant unfamiliar with hearing procedures appears before him"). This duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Cowart*, 662 F.2d at 735 (quoting *Cox v. Califano*, 587 F.2d 988, 991 (9th Cir. 1978)). The ALJ must be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are

elicited." *Cox v. Califano*, 587 F.2d at 991 (quoting *Rosa v. Weinberger*, 381 F.Supp. 377, 381 (E.D.N.Y.1974)).

The ALJ has a duty to develop the record such that it "contains sufficient evidence for the administrative law judge to make an informed decision." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1269 (11th Cir. 2007). This is so because "[u]nless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Cowart*, 662 F.2d at 735 (quoting *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979)). On the other hand, however, there must be a showing of prejudice before it is found that the claimant's right to due process has been violated to such a degree that the case must be remanded to the Secretary for further development of the record. *Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997) (citing *Brown*, 44 F.3d at 934–35). The court should be guided by whether the record reveals evidentiary gaps which result in unfairness or "clear prejudice." *Id.*

The Court finds that the ALJ has failed to fulfill his duty to properly develop the record in this case. First, the mere length of the record is not dispositive. The ability of an ALJ to make an informed decision does not depend upon the number of pages in the record.

Second, it was clear from the records before the ALJ that later treatment notes existed. In paperwork submitted in connection with his claim, Preast reported that he saw Dr. Le on February 5, 2015. Tr. 308. Dr. Le reported in a questionnaire dated November 24, 2015 that he last examined Preast on October 9, 2015 and stated on a May 2016 questionnaire that he first examined Preast on February 5, 2013 and last examined him on April 13, 2016. Tr. 619, 624. Dr. Zielinski reported on a questionnaire available to the ALJ that he last examined Preast on December 1, 2015. Tr. 620. Preast also submitted questionnaires and statements signed by Drs. Zielinski and Le dated November 20, 2015, November 24, 2015, December 3, 2015, December 11, 2015, and May 20, 2016, all of which were based on their treatment at the time the forms were completed. Tr. 617, 619, 620, 621, 622-23, 624-26. Despite these repeated references to more recent progress notes and treatment extending into 2016, the most recent progress note contained in the record was dated November 16, 2014. Tr. 598-603.

Third, the ALJ's failure to fully develop the record was prejudicial because the ALJ discredited Preast's testimony based on lack of treatment after November 2014. Tr. 22. Additionally, the ALJ accorded "little weight" to both treating providers' opinions, finding that they were inconsistent with their treatment notes, but only compared their opinions with records through November 2014. Indeed, the

very basis of each of these decisions by the ALJ are the gaps in the record evidence that the ALJ had a duty to take some effort to fill.

Additionally, since the Appeals Council did not consider the additional evidence, but perfunctorily accepted the ALJ's determinations, the prejudice was not cured or rendered harmless by the submission of the additional evidence to the Appeals Council.

**3. The Appeals Council's Decision to Accord No Weight to the Determination of the Florida Department of Retirement Services.**

The Appeals Council specifically considered the FDRS decision but gave it no weight because of "its lack of reference to any medical evidence and lack of any indicated author or attribution." Tr. 7.

A finding of disability by another agency is not binding on the Commissioner, although the Eleventh Circuit have held that it should be given great weight. *Bloodsworth v. Heckler,* 703 F.2d 1233, 1241 (11th Cir.1983); *see also* 20 C.F.R. §§ 404.1504, 416.904 (stating that a determination of disability by another agency is not binding on the Social Security Administration). "Even when an agency's definition of disability differs from that of social security law, if the agency's disability definition is construed in a similar manner as the definition of disability under social security law, it is error for the ALJ to not to give that agency's finding of disability great weight." *Hughes v. Comm'r of Soc. Sec. Admin.*, 486 F. App'x 11, 16 (11th Cir. 2012). However, "if the other agency's standard for determining

disability deviates substantially from the Commissioner's standard, is it error for the ALJ to give the agency's finding less than substantial weight." *Hacia v. Comm'r of Soc. Sec.*, 601 F. App'x 783, 786 (11th Cir. 2015).

The Commissioner relies on *Hughes* as supporting the Appeals Council's decision. However, the facts here are distinguishable from *Hughes*. In *Hughes,* the claimant submitted a single page disability determination from the State of Florida approving her for regular disability retirement, that provided no explanation of the basis for that determination *and* "offered no specific or additional evidence in conjunction with the State's determination that would lead to a different conclusion than that reached in the ALJ's decision." *Id.* at 16. In this case, in conjunction with the FDRS letter approving him for disability retirement benefits, Preast also submitted (1) a letter from the Florida Bureau of Benefit Payments addressed to Dr. Zielinski dated December 1, 2015 and signed by Hope Simmons, Disability Determinations (T. 617); (2) a Florida Retirement System Physician's Report (Form FR-13B) from Dr. Le, dated November 24, 2015 (t. 619); (3) a December 3, 2015, letter from Dr. Le (T. 616), and (4) a Florida Department of Retirement System Physician's Report (Form FR-13B) from Dr. Zielinski, dated November 20, 2015 (T. 620).

Thus, the Appeals Council's assignment of "no weight" to the FDRS decision based on lack of medical evidence is not supported by substantial evidence.[5]  *See Carty v. Colvin*, 2014 WL 2961128, *13 (M.D. Fla. July 1, 2014) (remanding matter to ALJ to "explain weight given to the Workers Compensation temporary disability determination or explain why 'great weight' was not given").

Accordingly, it is ORDERED:

1.      The decision of the Commissioner is REVERSED under sentence four of 42 U.S.C. § 405(g), and this matter is REMANDED to the Commissioner to consider the additional medical evidence submitted by Preast to the Appeals Council and to reconsider the weight given to the determination of disability by the FDRS.

2.      The clerk is directed to enter judgment in favor of the Plaintiff and close the file.

DONE AND ORDERED this 26th day of September, 2019.

/s/ Hope Thai Cannon

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

---

[5] This case is also distinguishable from *Hacia v. Comm'r of Soc. Sec.*, 2014 WL 12618103, *6 (M.D. Fla. May 14, 2014) because in that case Plaintiff's evidence was limited to an application for an identification card and a statement by Plaintiff's father that Plaintiff was approved for medical care based on a physician statement that he had a physical incapacity and disability.